IN RE ESTATE OF FRANK SCHROPFER.

MAHER & MULLIN, Appellees, v. I. J. SAYRS et al., Appellants, ANNA STARK et al., Interveners, Appellants.

No. 44173.

AUGUST 5, 1938.

REHEARING DENIED NOVEMBER 18, 1938.

Maher & Mullin, for appellees.

I. J. Sayrs, for appellants.

F. J. Lund, for interveners, appellants.

R. G. Remley, for Barbara and Marie Biernatzki.

RICHARDS, J.—On September 2, 1936, there was filed in the Hamilton district court an instrument purporting to be the last will of Frank Schropfer, deceased. On October 10, 1936, objections to the probating of the instrument were filed by Barbara Biernatzki, based on alleged mental incapacity of decedent, and undue influence. On October 13, 1936, the law firm of Maher & Mullin presented to the court two applications prepared by them, signed by one of the persons named as executors, and by several beneficiaries. One application asked that the two persons named in the purported will as executors be appointed as special administrators. The other asked that the court appoint Maher & Mullin as attorneys for the proponents of the purported will. On the same day these appointments were made as asked. On February 1, 1937, the matter of allowance of the instrument to probate came on for trial, Maher & Mullin appearing as attorneys for proponents, and R. G. Remley as attorney for contestant. A jury was impaneled, opening statements were made, and proponents had not completed examination of their first two witnesses, i. e., the persons who were the subscribing witnesses, when counsel for contestant suggested to counsel for proponents that there be a settlement. A recess was had, the attorneys conferred, an agreement was made. The agreement was that the instrument be allowed to probate, and that the executors use $1,000 of the funds of the estate by paying first, the taxable costs of the hearing, and second, by paying the remainder of the $1,000 to contestant's attorney. And so, on the same day, the instrument was allowed to probate.

On April 12, 1937, Maher & Mullin filed in the estate an application in which they set out the services they claimed they

had performed as attorneys for the proponents, and asked that the court determine the amount to be paid them as their compensation, and that the same be allowed as a claim of the first class and paid as a part of the costs and expenses of administration. The court fixed April 21, 1937, as the time for the hearing thereon and prescribed that 5 days notice be given to the executors or one of them. I. J. Sayrs, one of the two executors, accepted service. No notice was served on any other person. The application lay dormant until May 17, 1937. On that day Maher telephoned Sayrs that he, Maher, had arranged with the court that a hearing be had that morning upon the application, and asked Sayrs to come to the courthouse. Sayrs complied with the request. From the courthouse Sayrs telephoned to some of the proponents, in order that they be informed that the hearing was about to be had. Shortly thereafter on that day the hearing was held. There were present Maher & Mullin, the executor Sayrs, and Remley, who had been attorney for the contestant. There were also in the courtroom two of the proponent-beneficiaries to whom Sayrs had telephoned. The executors filed no pleading or resistance to the application, nor was any evidence offered by the executors with respect to the reasonable value of the services the applicants claimed they had performed. The hearing was brief. On part of applicants it consisted of professional statements made by Maher & Mullin, and the testimony of their witnesses, these being attorneys who stated their opinions as to the value of the services, basing their opinions on the alleged services as set out in the application and as amplified in the professional statements made by Maher & Mullin. On part of the executors the two beneficiaries who had come to the courthouse testified, and professional statements were made by Sayrs and Remley. In his statement, Sayrs said that he never had had a talk with applicants about their fees, but had been informed by the Starks that Maher was going to be very reasonable about his fees; that he felt that Maher was entitled to a good substantial fee but felt $5,000 was excessive. In Remley's professional statement he said he agreed with Sayrs that Maher was entitled to a good fee. On May 19, 1937, the court entered an order allowing the applicants $3,000 as compensation for their services. On May 21, 1937, Anna Stark and other beneficiaries filed a motion that the order of May 19 be set aside and that the application be heard by the court on its merits. They also filed a resistance

to the application. Maher & Mullin filed a resistance to the motion. Upon a hearing on June 28, 1937, the court overruled the motion of Anna Stark et al. The executors and Anna Stark et al., proponents, have appealed from the court's orders of May 19, 1937, and of June 28, 1937.

Upon the hearing on the motion of Anna Stark et al., appellants introduced testimony tending to establish facts and circumstances, which if true, were material to and in considerable measure determinative of the amount of compensation to which Maher & Mullin may have been entitled. Appellants claim that these facts and circumstances, to which we will refer, were not divulged to the court, and that there was a concealment thereof by Maher & Mullin which was intentional and wrongful and fraudulent in character, and in any event violative of the complete fairness and honesty that must always be exhibited by an attorney toward his client. Appellants claim that by conduct of such alleged character appellees profited. by obtaining an allowance greatly in excess of any amount to which they were entitled. Preliminary to relating the salient features of this testimony, and of that offered in resistance, we digress, to say that Barbara Biernatzki, contestant, and Anna Stark, one of the proponents, were the sisters and only heirs at law of testator. Each sister was bequeathed $500 and a life estate in 200 acres of land. But other provisions in the will make it evident that the children of Mrs. Stark, of whom there were several, are to benefit in larger measure than the one child of Mrs. Biernatzki. A successful contest would have resulted in the two sisters, and through them perhaps their children, sharing equally. The Biernatzkis as a family would have profited, the Starks would have received less.

Adverting to the testimony introduced on the motion to set aside the order of allowance, one admitted fact is that for a number of years prior to 1936 Frank Maher of the firm of Maher & Mullin had been the attorney and legal adviser of various members of the Stark family. It is also beyond controversy that these members of the Stark family had come to hold Maher in high esteem, and to have and feel complete confidence that he was fair and honest, and to be relied upon. This feeling of esteem and confidence especially characterized Max, one of the Stark family whom Maher had served as attorney for several years. It is also uncontroverted that, on account of this esteem and confidence, Anna Stark and several of her

children, including Max, upon learning that there would be a contest, directed Max to employ Maher as attorney to sustain the will. Maher & Mullin were residents of Fort Dodge. The estate was pending in Hamilton County, at Webster City. When Max informed Maher, at Fort Dodge, that a number of the Stark family desired to employ him, Maher inquired whether a special administrator had been appointed. Max answering in the negative, Maher said, ''Why, Max, they will close the door in your face. This is big league stuff.'' Max said he did not know anything about that. Within a day or two Maher journeyed to Webster City, prepared the applications for appointment of special administrators and of Maher & Mullin as attorneys for proponents, and procured the appointments, as already stated. Max testified that Maher had been his trusted attorney for so many years that he deemed it wholly unnecessary to have any arrangement concerning the compensation of Maher & Mullin, believing that their charges would be fair and reasonable; but that his mother, Anna Stark, 78 years old, and some of the other members of the family, insisted that there be an understanding. Max testified that on that account he asked Maher, in October 1936, to state what charges would be made, and that Maher answered that there was no merit in the grounds on which the contest was founded, that it would not come to trial, and that he, Maher, in such cases charged two, three, or four hundred dollars, and that in this case the charge for services out of court would not exceed $500. Max and his mother testified that he communicated this information to Anna Stark and others of the proponents.

On the morning of the hearing on the application of Maher & Mullin, Sayrs informed Maher, at the courthouse, that some of the Starks were there and wanted to talk to Maher. Maher replied, ''I have nothing to say to the Starks.'' Then Max sought out Maher, and asked whether he could talk to him a minute. According to Max's testimony Maher replied that there wasn't anything to talk about. Maher's version is that he said, ''There isn't much to say about anything.'' However, there followed a brief conversation between Max and Maher concerning which their testimony is in disagreement. Max testified that Maher said, ''What you say and I say will make no difference to Judge Clock.'' Max also testified that he told Maher that a fee of from $500 to $1,000 would be satisfactory, and that anything above

that wouldn't be right; that Maher said, "I have always treated you folks right" and also that Max was "up here trying to head off my payment"; that Maher said he thought the court would allow "five hundred, a thousand and possibly fifteen hundred." Max testified that during this conversation Maher appeared provoked, and that his words and appearance indicated to Max that Maher thought his honesty was being doubted. Max testified that, on that account, he felt humiliated and said to Maher, "Frank I was never so hurt in my life" and told Maher he was leaving the courthouse. Max did leave and was not present during the hearing. On the other hand Maher testifies that in this conversation Max said, "Sayrs says that you will make a showing as to the fee being worth $5,000", and that Maher replied, "Yes, I will not only make that showing but Mr. Burnstedt and Mr. Prince are here to testify as to the value of the services"; that Max said that, "If it is over $1,000 it won't be satisfactory to the girls"; that Maher said, "Whether it is satisfactory or not we are going to leave it to the court; that is what I am going to do", and that, "It is worth all that Mr. Burnstedt and Prince says it is worth. The court will make up his own mind and I will have to take it whether I like it or not, and whether you like it or not." Maher testified that Max thereupon said, "If that is all that is to it, I am going home and let the girls stay and do what they want to do. It don't make any difference what they say. Let them go ahead and contest it and do anything whatever they want about it. That is very satisfactory to me and I will go home right now."

Going back to the testimony of Max Stark that Maher stated in October 1936 that charges for services out of court would not exceed $500, there is also in the record the testimony of Winslow Stark that Maher assured him that, "We can settle this out of court, probably charge you three or four hundred dollars", and that Maher cited cases where he had charged that much fees. Cora Newton, another member of the Stark family, testified that on February 1, 1937, Maher said his time was valuable and that if the settlement was made his fees would be small and not anything compared to what they would be if there were a long trial, in which event his fees might amount to $1,500 or $2,000; that Maher said, "I settle these cases usually for three or four hundred dollars."

With reference to the testimony of Max Stark, Winslow

Stark and Cora Newton concerning statements made by Maher as to the amount he would charge, Maher testified that he did not have very much conversation with Max Stark with respect to fees and that he informed Max at the time the court appointed Maher & Mullin, that it was up to the court to fix Maher's fees and that Max wasn't involved with the proposition of whether the fee would be too big. Maher also testified that Max said that he and Winslow would take care of Maher and his fee by a separate amount, that they wanted Maher to have a good fee for what he was doing and that if the court didn't allow Maher enough, Winslow and Max would pay Maher outside so that he would have enough. Maher also testified that he never made the statement to Max that his fee would not be over $500 if the case didn't go to trial and never told Winslow Stark and Cora Newton that the fees would be $500 or any amount; that he never advised any of the Starks that the fee under any condition would be a specific amount.

Although there appears these contradictions, there was further testimony, that of E. J. Hayes, a wholly disinterested witness. In argument all parties treat the testimony of this witness as being unquestionably worthy of belief. From the record we are likewise impressed. We set out the testimony of this witness upon examination in chief as it appears in the abstract:

"I am a priest by profession and have acted in that capacity at Duncombe, Iowa, continuously since in September 1931. The Stark folks have been members of my church since 1931. I learned of this will contest in the Frank Schropfer estate in September 1936. I have known Mr. Maher about six years. Myself and Mr. Maher are rather friendly and I visited with him a number of times. I met him in Webster City one morning. I just casually asked him what he was doing in Webster City and he told me he was there on the Schropfer estate and he said there was going to be a lawsuit and I said, 'Why not settle this peacefully? Would it be agreeable with you to accept four or five hundred dollars for your trouble so far?' Frank at that time didn't answer me. I met him a couple of days later at Fort Dodge and I don't recall whether he said he would take either four or five hundred dollars if the case was dismissed. This was either the last week in October or the first week in November, 1936."

Although Maher testified in his own behalf, he neither denied, nor offered any explanation of, the testimony of this witness. But in this court appellees say that the witness Hayes meant that he didn't recall whether any statements were made respecting amount of fees. However, the cross-examination of this witness, which Maher personally conducted, reveals no effort to develop that the witness intended the meaning now ascribed by appellees to the testimony in chief. On the contrary in the cross-examination is found this: "I talked with Mr. Lund about this matter. * * * He asked me about the $500." Viewing in its entirety the testimony of this witness we are unable to adopt appellees' theory as to its meaning. It appears rather that the thought the witness sought to convey was that he could not recall whether it was $400 or $500 that Maher said he would take for his troubles so far, in the conversation at Fort Dodge. This conversation the witness seems to distinguish from the one occurring a couple of days previously, at Webster City, when the same information was sought, but Maher said nothing.

In the hearing in which the allowance was made none of the four persons were called as witnesses, to whom, allegedly, Maher made representations as to the amount that he would charge, except Cora Newton whose alleged information was limited to the occasion when the statement was made on February 1, 1937. We have recognized that heirs may by agreement fix the amount of the administrator's attorney's fees, and whatever they agree upon is of no concern to anyone else, where no rights of creditors are involved. In Estate of Lane, 199 Iowa 520, 202 N. W. 244; In Estate of Olson, 213 Iowa 784, 239 N. W. 527. That it was Maher's endeavor to avoid the presence, at the hearing, of the Starks, among whom were three of these persons allegedly having information as to his representations, is a reasonable inference from the following portion of Maher's testimony pertaining to happenings at the courthouse on the morning of the hearing:

"Q. Then when Mr. Sayrs told you that he wanted to call the Starks, you found fault with it and said, 'What do you want to call the Starks for; they have nothing to do with it. You and the other executor are the whole thing here. A. Well, I don't know how much was said on that. I think that was more or less true what you say. I think the executor and the court are

practically the whole thing, but I stood there while he telephoned them.''

Quite consistently with the foregoing, the conversation of Maher with his client Max Stark, just before the hearing, appears to have effectively disposed of the presence of Max.

The order appointing Maher's firm as counsel for proponents appeared to the district court as warranting the fixing of the compensation. But it did not divorce these attorneys from their clients, the Starks. The latter were still entitled to full disclosure from their attorneys, of every fact pertaining to their interests. With that in mind it may be said that a rather startling disclosure is found in the record. That is, it was not until after the hearing was in progress, and while Maher was making his professional statement, that it was divulged to Sayrs, the executor, or to any of the Starks (excepting only what Maher claims he said to Max in the conversation on that morning, which Max denies), that Maher & Mullin were claiming the sum of $5,000. In his professional statement Maher stated that was the amount. The application was silent as to the sum sought to be obtained. On the hearing on the motion to set aside the allowance, Sayrs, the executor, testified that he was relying on information from Max concerning a reasonable amount that Maher would demand, consistent with assurances Max said he had from Maher. Sayrs testified he would have procured testimony in resistance had he known any such amount would be demanded.

Anna Stark et al., appellants, also point out that Sayrs, the attorney who had drawn the will, was the beneficiary therein of a $1,500 bequest and of a provision that he receive $750 as one of the executors and $1,000 as attorney in the estate; that Remley was the attorney for the contestant and that in the settlement of the contest Maher had insisted that $1,000, less taxable court costs, be paid to Remley to apply on his attorney fees. Anna Stark et al. urge that from these circumstances it is clear that neither Sayrs nor Remley, who alone appeared for any person adverse to Maher & Mullin, were in position to protect the estate, and that this is corroborated by the professional statements they made.

Another matter shown by appellants is that in their application Maher & Mullin set out services they claimed they had performed, summarized as follows:

Interviewing witnesses, ......3½ days;
Conferences, ...............1½ days and 16 hours;
Briefing, ....................8½ days;
Appearance in court, ........3   days;
Other work including prepara-
   tion of motions, etc. ......6½ days and   2 hours;

Total:   23 days and 18 hours

Appellants also show that Maher & Mullin admit that they were ready and prepared and sought to try the case in November 1936. Perusal of the dates of the items set out in the application reveals that up to the date the case was admittedly prepared and ready for trial in November, only nine days of time expended by Maher & Mullin is shown. Appellants urge that the present claim for 23 days and 18 hours time expended, in view of the case having been prepared for trial in November 1936, evidences that the claim contains either unwarranted or unperformed services. They also urge that the alleged 8½ days briefing is a case involving the issues of incompetency and undue influence, was, if actually done, unnecessary and for the purpose of building up their charges.

An executor is an officer of the court subject to its orders until the estate is closed. The matter of his compensation and expenses is at all times subject to the court's revision. Likewise orders of allowance made to him for services of his attorneys, prior to the enactment of what is now section 12064, Code 1935 were subject to like revision. In re Estate of Sawyer, 124 Iowa 485, 100 N. W. 484. By reason of section 12064 the allowance is now made directly to the attorney rather than to the executor for his attorney. But in this procedural change there is no detraction from the powers of the court to revise allowances, in like manner as in the case cited. The situation respecting compensation of an attorney, appointed by the court, to represent an estate, has the same characteristics as formerly, and the same reasons obtain for holding that the court may revise an order made with respect to an attorney's compensation. Any other theory of practice  would be susceptible  to abuse, and so destructive to the rights of parties in interest to obtain a proper revision of such an order, that the court should decline to give it indorsement in the absence of any compelling statutory provision contra. In view of a resubmission of the application, we

586

express no opinion as to the merits or demerits of the various fact issues that were involved in the submission of the motion to set aside the allowance and for resubmission. It is sufficient that we say that it is our opinion that it was shown that there were material and important issues respecting the proper amount of compensation, concerning which the court was not informed, or to which the executor failed to call the court's attention, as for instance matters appearing in the application itself. The trial court should have set aside the order of allowance to the end that, upon a resubmission, the court may have before it all material matters, rather than a part of them, and to the end that the appellants have their day in court.

The motion of appellees to dismiss the appeal is overruled excepting that it is ordered that the argument of Barbara and Marie Biernatzki, filed by them as appellants, be stricken by reason of their failure to show that they appealed.

There is a reversal.—Reversed.

SAGER, C. J., and HAMILTON, ANDERSON, STIGER, KINTZINGER, and MILLER, JJ., concur.

MITCHELL, J., takes no part.